Case 1:13-cv-01621-ELH Document 1 *SEALED* Filed 06/04/13 Page 1 of 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| James A. Powers, Individually<br>6808 Brennon Lane<br>Chevy Chase, MD 20815<br><br>Plaintiff,<br><br>v.<br><br>Jeff Braun<br>104 Green Way<br>Allendale, NJ<br>07401<br><br>and<br><br>Nathan G. Fink, Esq.<br>470 New Milford Avenue<br>Oradell, NJ 07649-2232<br><br>Defendants. | ) |

## **Complaint**

Plaintiff, James A. Powers and acting pro se, brings this action for breach of contract against Defendant Braun, and for tortious interference and unfair competition against Defendant Fink. In support of these claims, Mr. Powers alleges as follows:

1. Plaintiff James A. Powers is an individual residing in Chevy Chase, Maryland and licensed to practice law in the states of Maryland and New York and in the Commonwealth of Virginia.
2. Defendant Jeff Braun is Wall Street commodities trader residing in Allendale, New Jersey.
3. Defendant Nathan Fink is a tax attorney with an office in Oradell, New Jersey and upon information and belief, is only licensed to practice law in New Jersey.
4. Jurisdiction exists under 28 U.S.C. Section 1332 as this case involves citizens of different states and the requisite amount in controversy is met.
5. Venue is appropriate under 28 USC § 1391(b)(2) as a substantial part of the work and services rendered by your Plaintiff and subject to this suit were undertaken and performed in this judicial district.

6. In February of 2012, Defendant Braun retained and entered into a written contract for legal services with plaintiff (copy of retainer appended) with the initial engagement being to endeavor to resolve a business dispute with Mr. Braun's estranged business partner, Mr. Dale Weingarten.

7. Within days of being engaged, Mr. Braun was sued by Mr. Weingarten in New York's Supreme Court in a massive action alleging an array of tortious and illegal conduct and seeking an immediate Temporary Restraining Order (TRO) wresting the Golden Goal business from Mr. Braun and giving it to Mr. Weingarten to run and operate.

8. Mr. Braun then asked Mr. Powers to handle this New York litigation for all defendants including: 1) Mr. Braun personally, 2) two limited liability companies Mr. Braun and Weingarten formed to jointly owned their sports park business, 3) a third single member LLC formed and controlled by Mr. Braun without Mr. Weingarten, and 4) Mr. Jonathan Jossen (an individual who worked for Mr. Braun and helped run the Golden Goal business).

9. At its core, the Weingarten suit was a fight over 1) control of one LLC that in which the two men own some rather valuable real estate jointly purchased by Braun and Weingarten, and 2) control over another LLC that operated a not-so-valuable sports-park business known as "Golden Goal" and which was formed concurrent with the LLC owning the land. The Golden Goal business itself had been run by Mr. Weingarten directly and was an economic failure.

10. [redacted]

11. [redacted]

12. [redacted]

[redacted]

13. [redacted]

14. [redacted]

15. [redacted]

16. The NY litigation continued with calendar constraints forcing New York Supreme Court Justice Stan Pritzker to hear the Weingarten TRO request in small time blocks of time stretched over a series of many weeks. Accordingly, for much of the Spring 2012, the parties regularly travelled to upstate New York (on four different occasions) for a series of evidentiary hearings involving a half dozen individuals including fact and expert witnesses and dozens of exhibits.

17. In the late evening of April of 2012, with the hearings ongoing, Mr. Powers received a call from one of Mr. Braun's accountants who had himself just testified before Judge Pritzker, inter alia, about the percentage ownership interests that Mr. Braun and Mr. Weingarten held in one of their Golden Goal LLCs.

18. The accountant called to warn Mr. Powers that Mr. Fink was suggesting to this accountant and to Mr. Braun that 1) Mr. Powers litigation strategies were misdirected and wrong, and 2) that the accountant and Mr. Braun should do what Mr. Fink was instructing vis-a-vis a proposed IRS filing that Mr. Fink and Mr. Braun wanted to make which filing would factually conflict with

the testimony given to Judge Pritzker and New York court about the ownership interests in that Golden Goal related LLC.

19. Mr. Powers was disturbed by the accountant's call and warning but far more troubled by the fact that Mr. Fink, a New Jersey tax attorney, was clearly both maligning and attempting to control a case and its witnesses (the accountant and Mr. Braun) and all for a legal matter in a jurisdiction which Mr. Fink admitted he was not licensed to practice in.

20. [redacted]

21. [redacted]

22. After this event, Mr. Fink and Mr. Powers relationship was strained and contact diminished.

23. [redacted]

24. In September 2012, and as the parties were awaiting the New York Supreme Court's decision on the TRO, Mr. Powers was contacted by opposing counsel Joseph Cerra, Esq. who accused Mr. Braun of committing a fraud on the court and of procuring and presenting false testimony to the New York court.

25. In a scathing letter to Judge Pritzker, Mr. Cerra alleged that Mr. Weingarten had been sent a proposed IRS filing issued by Mr. Braun and his accountants and which contained facts directly

contradicting the sworn testimony that Mr. Braun's accountant had given during the TRO hearings as to the LLC ownership interests held by Braun and Weingarten.

26. Mr. Powers was stunned by the Cerra allegations because neither Mr. Braun, Mr. Fink nor the accountant had mentioned any planned filing, no one had given him any notice of one and he did not even have a copy of the planned filing.

27. [redacted]

28. Unable to reach Mr. Braun by text, phone or email, Mr. Powers was contacted by Mr. Fink that same afternoon.

29. [redacted]

30. [redacted]

31. [redacted]

32. In Mr. Powers opinion, the actions taken by Mr. Fink and Mr. Braun were intentional, material and detrimental to Mr. Braun's position in the New York litigation.

33. For the next two weeks Mr. Powers endeavored to conference and/or meet with Mr. Braun to understand how and why 1) he was not professionally consulted, and 2) his concern that the

Case 1:13-cv-01621-EHL Document 28-1 Filed 06/04/14 Page 6 of 11

New York litigation was being manipulated and controlled (and in Mr. Powers opinion, harmed) by the actions of Mr. Fink.

34. Mr. Braun avoided facing Mr. Powers claiming he did not have time for either a phone call or a meeting.

35. Mr. Powers, realizing securing a meeting with Mr. Braun would be futile and that Mr. Braun would not admit or face his own actions, resigned citing 1) the betrayal of the client trust and 2) the intentional interference in the case by Mr. Fink.

36. Mr. Braun accepted Mr. Powers resignation without challenge or complaint and asked only that Mr. Powers provide assistance in a transition to his new legal counsel.

37. From September to November 2012, Mr. Powers worked with the two new law firms that Mr. Braun personally hired giving whatever aid and assistance was requested.

38. In November, 2012, after giving all such aid and coordination, Mr. Powers tendered his final bill but Mr. Braun did not pay it.

39. In December and January, when he pressed Mr. Braun for payment, Mr. Braun demurred saying he needed just a bit more assistance provided to his new lawyers and that he was also awaiting developments in the case. Mr. Powers told Mr. Braun he was being abused by being asked to continue to help new counsel while not being paid but Mr. Powers nevertheless continued to cooperate and give aid because to do otherwise might have hurt his clients in the New York litigation.

40. In early 2013, just before a critical hearing in the New York litigation, Mr. Powers was again asked to examine and report on key issues and facts and to help the new attorneys prepare and he did so spending hours on the eve of the hearing to ensure the new attorneys had what they needed.

41. In May of 2013, the New York court issued its decision on the TRO granting Mr. Braun a full and complete victory by denying the TRO completely. The decision included a denial of all motions and efforts to find Mr. Braun in contempt and in the opinion the court cites some of the testimony and evidence adduced during the TRO hearings Mr. Powers oversaw.

42. Hoping a resounding victory would motivate Mr. Braun to honor his contractual obligations and pay his legal fees, Mr. Powers asked yet again for Mr. Braun to pay the final bill but Mr. Braun now completely refused to communicate. The only communication ever received from Mr. Braun on this fee matter were from a New Jersey criminal lawyer who sought to mediate the dispute but when informed of 1) Mr. Braun's complaints on Mr. Powers performance and of 2) Mr. Fink's actions and interference, the attorney literally disappeared and did not respond to repeated emails and phone calls asking if he represented Braun and would accept service of process for Mr. Braun.

43. All efforts to have Judge Pritzker and the New York court schedule a hearing on this fee dispute failed and lacking any ability to communicate with Mr. Braun or his counsel, this breach of contract action has been brought.

44. Lacking an ability to address Mr. Fink's interference with Mr. Powers conduct of the New York litigation, his interference in the client relationship and Fink's unfair competition, this action is brought against Mr. Fink.

45. As of this filing, Mr. Braun owes Plaintiff $11,577.25 per the attached June invoice with an additional $4,260 owed for the 14.2 hours spent (@ $300/hr) on collection and pursuit of enforcement of the contract for a total due of $15,837.25.

**<u>Count 1 - Breach of Contract by Braun</u>**

46. Plaintiff repeats the allegations of paragraphs 1 through 45 above, as if set forth hereat.

47. Mr. Braun contracted for legal services, received legal services, a favorable judicial result was obtained as a result of those services, and Mr. Braun never objected to or complained about those services to your Plaintiff and to date he has refused to pay for them thereby breaching the 2012 contract he entered into with Plaintiff.

48. Upon information and belief, Mr. Braun has been advised by Mr. Fink to not pay service providers despite contractual obligations to do so but also without communicating or professionally conveying the basis of his concerns and why he should not pay the bills for the services he asks for and receives.

Case 1:13-cv-21622-HLH Document 1 *SEALED* Filed 06/04/13 Page 8 of 11

49. Mr. Braun's non-payment of outstanding invoices is a material breach of contract and has caused damages at least in the amount of $11,577.25.

**Count 2 - Tortious Interference by Fink**

50. Plaintiff repeats the allegations of paragraphs 1 through 49 above, as if set forth fully.

51. Mr. Powers and Mr. Braun had a contractual relationship that Defendant Fink willfully interfered by clandestinely instructing his client and other professionals to take actions materially affecting the New York litigation.

52. Mr. Fink had no legal right to make decisions and take actions that he knew had or would have a material effect on the New York litigation and where Mr. Fink knew he was not authorized to practice law in New York.

53. Mr. Fink's interference with the existing Braun-Powers contract was repeated, intentional and damaging.

54. As a result of Mr. Fink's interference, Mr. Powers has been damaged in the form of lost income and lost time and in amounts to be proved at trial.

**Count 3 - Unfair Competition by Fink**

55. Plaintiff repeats the allegations of paragraphs 1 through 54 above, as if set forth fully.

56. Mr. Fink's engaged in the tort of unfair competition by taking over aspects of the New York litigation and by competing with Mr. Powers in so doing.

57. Upon information and belief, Mr. Fink has and continues to enjoy a lucrative financial relationship with Mr. Braun and his intentional interference (outlined in Count 2) was a part of his campaign of unfair competition.

58. Mr. Powers has been damaged by Mr. Fink's unfair competition in amounts to be proved at trial.

**WHEREFORE,** Plaintiff seeks a judgment and award of:

1. Breach of Contract damages in the amount of $11,861.35, accrued fees and costs of collection in the amount of $4,260;

2. All actual damages arising from Mr. Fink's tortious interference and unfair competition and specifically including a exemplary/punitive award in the amount of $1,000,000 to both punish Fink and deter other counsel from engaging in similar acts of misconduct and interference with foreign litigation;

3. Plaintiff's reasonable attorneys fees;

4. Such other relief as this court deems just and proper.

Respectfully Submitted,

James A. Powers

Law Offices of James A. Powers, Esq.
6808 Brennon Lane
Chevy Chase, Maryland 20815

580 5th Avenue
Suite 337
New York, New York 10036

jpowers@data-rights.com
Telephone: (301) 915-8088
Facsimile: (866) 472-4753

**LAW OFFICES OF**
**JAMES A. POWERS**
**6808 Brennon Lane**
**Chevy Chase, MD**
**20815**

February 22, 2012

Mr. Jeff Braun
10 Green Way
Allendale, NJ 07401

Re: Retention Agreement

Dear Jeff,

Thank you for selecting my firm to advise and represent you and your various Golden Goal related companies in matters relating to intellectual property counsel and litigation. Our policy at the outset of an engagement is to outline the basis upon which we will provide services and bill for them. This engagement letter confirms our understanding and establishes a general framework for all matters you may authorize us to handle for you or your companies. As you will see in the enclosed General Terms and Conditions of Engagement, we take pride in our variety of alternate billing arrangements, but absent agreement, we charge for our professional services and my 2012 rate is $350 per hour. Please note that we will work with your existing corporate to put in place whatever additional legal understandings may be necessary or desirable to ensure the attorney-client relationship is always specifically identified.

We agreed upon a $5,000 retainer and please make that out to "Law Offices of James A. Powers." In closing, please indicate your acceptance of the terms of this letter and of the General Terms and Conditions by signing and returning a copy of this letter by fax, email or mail.

Sincerely,

James A. Powers

Accepted:

Jeff Braun

Cc: Administration

(301) 651-9394 Fax: (866)-472-4753
jpowers@data-rights.com www.data-rights.com

## General Terms and Conditions of Engagement

This statement to our clients explains the Firm's billing policies and procedures. Should you have any questions concerning these policies and procedures, please do not hesitate to contact us at any time. The Firm assigns to each client matter a billing attorney who is responsible for preparation of fee statements. The amount of legal fees charged on the billing statement is the fair value of the services provided as determined by the billing attorney taking into account the time records for the matter, the types of services we have been asked to perform, results obtained, and other relevant circumstances.

As we have discussed, we will use traditional hourly billings for most of the work we will perform for you. However, we have also discussed, and on a case-by-case basis we can also agree on the following compensation plans:

1) Fixed fee billings for routine and predictable matters,
2) Contingent billings based upon the actual outcome realized by our representation be it a case, transaction or dispute; or
3) Hybrid fees whereby we are paid a portion of our fee on an hourly basis but share in responsibility for the result by including a contingent or fixed price element for the balance of our compensation.

In addition to our fees for legal services, we also charge separately for various support services such as long distance telephone services, computerized legal research, local messenger services, desktop publishing, secretarial overtime, in-house photocopying, facsimile transmission, and off-site client document storage. Likewise, expense disbursements for airplane tickets, hotel charges, local transportation, outside copying and courier services, court reporters, expert witnesses and other expenses incurred on behalf of a client are itemized separately. Large disbursement billings may be forwarded to the client for direct payment to the supplier. We ordinarily render our billing statements on a monthly basis, but can reasonably adjust this upon request. We make every effort to include charges for support services and disbursements in the statement for the month in which they are incurred. Charges which are not available until the following months (e.g., long distance telephone service) will appear on the monthly statement as soon as they are available, or on a supplemental statement if received after our work on a matter is completed.

Billing statements are due and payable upon receipt. Clients whose statements are not paid within 60 days of the statement date will be assessed a late charge on the unpaid balance at a rate of 1 % per month. In addition, the Firm reserves the right to withdraw from further representation in the event of non-payment of statements. It is our general policy to obtain an advance retainer from new clients but this requirement is waived in this case because of our long-standing relationship. During the course of our work on a matter, we may provide an estimate of anticipated fees in response to a client request for budgeting information. Because of the inevitable uncertainties involved, such estimates are only an approximation of potential fees and cannot be considered a maximum fee quotation. Our actual fees will be determined, and statements rendered, in accordance with the policies and procedures described above. As always, if you have any questions concerning specific charges included in your billing statement, or wish to discuss further any of our billing policies and procedures, please feel free to contact us.

(301) 651-9394 Fax: (866)-472-4753
jpowers@data-rights.com www.data-rights.com