**IN THE UNITED STATES DISTRICT COURT**
**<u>FOR THE DISTRICT OF MARYLAND</u>**

James A. Powers, Individually
6808 Brennon Lane
Chevy Chase, MD 20815

Plaintiff,

v.

Jeff Braun
104 Green Way
Allendale, NJ
07401

and

Nathan G. Fink, Esq.
470 New Milford Avenue
Oradell, NJ 07649-2232

Defendants.

**DECLARATION OF**
**<u>JAMES A. POWERS</u>**

I, James A. Powers, state that I am over the age of 18 and am competent to testify from personal knowledge to the matters stated herein, and state as follows:

<u>Overview of Tort and Contract Actions</u>

1. This action was brought to 1) recover damages for malicious and tortious conduct undertaken in concert by both Defendants and 2) to recover monies owed under contract by Defendant Braun.
2. The contract claim is simple and nowhere in any of the papers is there any defense to the claims only an invocation of the NY Fee Mediation process. However, as explained to Mr. Braun, NY's system does not apply and is not available when the client has made

allegations and complaints of negligence or mishandling of legal matters as Mr. Braun has. See the Gallo Affidavit filed concurrently herewith that establishes that Mr. Braun has, was and is making allegations professional misconduct but he never had the integrity or professional courage to share his complaints with me. As the Brackett Affidavit confirms, he admits he never told me of his complaints and makes the silly claim that he did not believe he could talk to me. See Brackett Affidavit at Para. 9 (the Affidavits and Declarations are appended to the Consolidated Response of Plaintiff to Defendant's Motions)/

3. The Defendants caused tortious injury in Maryland and both men engaged in a persistent and longstanding course of contacts with your Plaintiff in Maryland and spanning a period nine (9) months. Plaintiff requests a confidential hearing in which we will show the hundreds of contacts with this forum and this is needed because these communications and contacts contain attorney-client privileged materials.

4. This case centers on a malicious tort where one attorney knowingly and deliberately took actions to interfere, take over and negatively and materially affected another attorney's handing of a piece of litigation. That litigation was Dale Weingarten v. Jeff Braun et al. pending in the Supreme Court of the State of New York. In his Declaration, Mr. Fink tries to tell this court this is just some conflict over professional opinions and that his opinion prevailed. That's misleading, if not outright false. See Affidavit of Thomas P. Gallo. This was not mere opinion, this affected trial strategy, witness credibility and client success.

5. This is also not a simple 'lawyer opinion' conflict because if done properly and ethically, such disputes are known and open and resolve themselves one of two ways - realignment

of the attorneys or end of the client relationship for one of those attorneys. I would have accepted either had there been a chance. Here, instead of proceeding forthrightly and with candor, by citing perhaps the conflicting strategies or counsel, or even citing a lack of confidence or trust in my work, Mr. Fink and Mr. Braun both chose to remain silent, to let me work on while they took secret and unilateral action.

Failure of Braun to Communicate

6. That Mr. Braun lacked the integrity or candor to simply speak to me about his complaints or concerns is regrettable. But his explanations of his silence - that he believed he could not talk to me, his attorney about problems - is ridiculous and just not believable. What seems to have happened is that Mr. Fink and Mr. Braun just decided to do what they wanted while letting me keep telling the court what they wanted the court to believe. The professional impacts of being a victim of this tort are real: No judge looks at counsel the same when they are involved in events like those that unfolded in September 2012. I was unwittingly made privy to conduct I did not know was being undertaken and had I known, I would have vigorously objected to it, worked with my client to address the conflict, or resign.

7. In the Affidavit of Kathy P. Brackett, we find Mr. Braun's explanation that he did not know he could complain to me, his attorney. Brackett Para. 9. When he expressed these word, they were deemed incredible by Ms. Brackett and upon examination by anyone, the same result obtains. The answer is just silly and this Wall Street commodities trader does not lack a voice. Over the course of nearly a year, I personally observed Mr. Braun to act decisively, to move with authority and to show no compunction or distaste for using caustic words, harsh criticism and making decisive firings of personnel and/or contractors

and vendors if he was not satisfied. What explains his inability to speak to me was that he (and Mr. Fink) sought to use me to make the NY court see one thing while they secretly did another. That is the gravamen of this case and the interference and unfair competition this represents are actionable torts.

8. Mr. Fink has no excuse for his unfair competition and tortious interference in litigation he was not even licensed to handle. He knew I served as lead and sole counsel for the NY Litigation, early on he endeavored to control that case (See Gallo Affidavit and the April 2012 effort to interfere) and when that was not satisfactory, rather than work to remove me professionally, he and his client conspired to take unilateral actions that cause opposing counsel to accuse me of suborning perjury and working a fraud on the NY court.

9. And compounding the damage from the tortious conduct is that Mr. Braun accepted my resignation (see attachment), asked that I work to help his new counsel (which I did) and then refuses to pay my final bill. All without a single letter, word or communication to me about his complaints and all while telling others of those complaints. It's a pattern and a bad one: Mr. Braun take benefits from those he hires, he uses them for as long as he deems satisfactory, he becomes dissatisfied but does not tell the party with whom he is dissatisfied, and then, when he is ready, he terminates or jettisons that party.

10. Plaintiff submits herewith, three additional Affidavits from 1) Jeffrey L. Goodman, Esq., Mr. Braun's former counsel and a party to the NY litigation, 2) Thomas P. Gallo, Mr. Braun's accountant and a witness in the NY Litigation, and Kathy P. Brackett, who

worked for Mr. Braun in a range of roles and who supported the NY litigation.[1] Collectively, they paint a factual picture of mendacity and Machiavellianism.

11. This tort action can be maintained because the torts occurred outside of Maryland, caused injury in this state and they arose from parties who had a course of contacts with this state. Maryland Long-Arm Statute, Maryland Courts & Judicial Proceedings Article Sec. 6-103, provides in subpart (4) for the constitutional exercise of jurisdiction where a party engages in tortious conduct causing injury in Maryland and in so doing 'engages in any other persistent course of conduct in' this state.

12. Here, the tortious injuries are 1) is the intentional interference by Mr. Fink in the New York legal matter which I was handling and which, upon information and belief, were deliberately undertaken by Mr. Fink after I had placed witnesses before the court, and 2) his acts of unfair competition in which he unfairly worked to have his professional services provided instead of my own. See Affidavit of Thomas P. Gallo in which he details how Mr. Fink instructed Mr. Gallo, who was Mr. Braun's accountant for many many years, to prepare an IRS filing that contradicted the testimony of witnesses that we had presented to the court. See also Attachment --- 9/13/12 letter from J. Cerra to J. Powers detailing the allegations of false or misleading testimony being presented to the NY State court. See also the Affidavit of Jeffery L. Goodman establishing that he too construed the actions of Mr. Fink as causing the court to believe that both he and I had suborned perjury or had otherwise attempted to mislead the NY Court.

Persistent Course of Conduct in Maryland

---

[1] Ms. Brackett is my sister.

13. The actions of Mr. Fink here are outrageous and they make difficult the balancing the obligations owed to the client (Mr. Braun) with the need to address this unusual attorney misconduct. To respect the client, Plaintiff requests a closed or confidential hearing in which evidence can be presented showing the persistent course of conduct engaged in by both men in this state. Totaling in the hundreds, these emails, calls and communications show a persistent course of administration and control of the litigation.
14. The Gallo and Goodman Affidavits show how Mr. Fink tried to control the case, tried to interfere in it in April of 2012 (but was blocked) and in September 2012 he successfully interfered by telling a witness, Mr. Gallo, to undertake certain actions.
15. The actions of Mr. Fink, a licensed attorney, in secretly and deliberately interfering in another attorney's litigation are disturbing. Attorney's are supposed to be the civil litigators. Civil court is supposed to be the forum in which we resolve disputes in an orderly, respectful and open way. Yet in this case, we have a NJ Attorney trying to sway and control Mr. Gallo, a witness in NY litigation, and to do things Mr. Fink and Mr. Braun desired (namely to get some IRS refund monies) and all while deliberately concealing this information from me, Mr. Braun's counsel and the attorney who had just recently placed Mr. Gallo before the NY court as a witness.
16. The proper course here should have been for Mr. Braun or Fink to reveal their plans, and if those plans could not be endorsed, supported or ethically carried out by me, or I somehow resisted or disagreed with them, then the option would be to replace me.
17. Mr. Fink and Mr. Braun continuously communicated with me from this state, they knew I was working from Maryland (only Mr. Fink tries to deny falsely this but his own many

emails show he knew or should have known otherwise), and Mr. Braun regularly sent communications, instructions and payments to Maryland.

18. When the continued, knowing and purposive contacts with Maryland are combined with the acts of tortious interference and unfair competition engaged in by both men in the September 2012 episode, we satisfy the twin elements our Maryland Long-Arm statute: Namely, 1) a tortious injury in Maryland arising from an act outside this state, and where that injury relates to 2) a persistent course of conduct in activities in Maryland.

19. This case is precisely about tortious interference by one attorney in the work of another, a rare occurrence based upon case law found thus far.

Awareness of My Maryland Location

20. Mr. Braun was aware that I was travelling from Maryland to attend to the NY litigation and in the requested in-camera or confidential hearing, Plaintiff will present evidence showing that awareness from bills, invoices, emails and phone communications.

21. Mr. Fink as well knew that I was based in Maryland and before retaining me for the NY litigation, and never mentioned by either Defendants, Mr. Braun had hired me in January of 2012 (and in part because I was in Maryland and close to the US Patent and Trademark Office) to handle needed filings for the federal trademarks owned by the Golden Goal sports park business.

22. From the beginning of my representation of Mr. Braun in January of 2012, I knew that Mr. Fink was Mr. Braun's close confidant and his federal and New Jersey tax advisor. For his part Mr. Fink told me that he was not a NY attorney and that he knew he could not ethically handle the New York litigation that Mr. Braun and his companies faced.

23. During the course of the NY litigation I exchanged dozens of emails with Mr. Fink and dozens of phone calls and Mr. Fink initially tried to dictate to me how to handle the NY litigation which I found professionally inappropriate and resisted.

24. Notably, as I worked on the NY litigation, it became clear that Mr. Fink was materially involved in some of conduct that gave rise to the litigation and told him of those concerns/findings. In no small part, I believe Mr. Fink took actions against me because I identified his participation and challenged him on it.

Status of NY Litigation and Powers Effort on Fees

25. Defendants assert that the fee aspect of this case is pending before the NY courts and this is incorrect. Having no standing and no status at all in the NY Litigation, the motion made to have my fees paid remains in an undetermined state. When last checked the file for the NY Litigation was 'in transit' between the upstate NY court that originally had it and the Manhattan, NY court that is now to control the case. In short, I have no belief or expectation that the fee motion would ever be heard and will withdraw that motion if needed. So this court is aware, all of the efforts on the fee motion were to have this matter heard before Judge Pritzker, the judge hearing the TRO.

26. As to the efforts to have NJ licensed Mr. Fink investigated by the NY court because of his interference with that tribunal, that is the decision of the NY court, does not affect my fee or tort claims, and as an ethical matter I have no intention of withdrawing that request that our NY rules and laws be applied.

Malice by Fink

27. When the events of September 2012 unfolded, it was surreal. For two days my client literally hid and dodged emails, texts, and calls.

28.

REDACTED

29. Compounding the damage and harm from the interference, Mr. Fink concealed his plan, concealed his work with Mr. Gallo and did not even reveal what he had done once it was made public. I only learned of matter after opposing counsel did and only because opposing counsel, as a professional courtesy to his adversary called to alert me he was going to the judge to cite what he saw as a fraud on the court or perjury by the witnesses. See Attached Letter from Joseph Cerra, September 13, 2013 at Tab 1.

30. As to the NY Fee dispute procedures, they are simply not applicable to this case because of the misconduct, complaints and other misbehavior and all as I explained to one of the many attorney's Mr. Braun has used. See Attached Letter to Marc Leibman of February 4, 2013 at Tab 2.

31. In closing, in nearly thirty years of law practice, I've never seen or heard of an attorney engaging in the conduct of the type engaged in here.

I solemnly affirm and declare under the penalties of perjury under the law of the United States of America pursuant to 28 U.S.C. Sec. 1746 and upon personal knowledge that the contents of the foregoing are true and correct.

Dated: August 9, 2013

James A. Powers

<u>Tab 1 to Powers Declaration</u>

Letter from Joseph Cerra, September 13, 2013

FORMAN HOLT ELIADES RAVIN & YOUNGMAN LLC

ATTORNEYS AT LAW

Joseph M. Cerra
Member
jcerra@formanlaw.com

September 13, 2012

**BY FAX, EMAIL AND OVERNIGHT MAIL**

Honorable Stan L. Pritzker, J.S.C.
Supreme Court of New York
Washington County
383 Broadway
Fort Edward, NY 12828

Re: Weingarten, et al. v. Braun, et al.
Index No. 12/20082

Dear Judge Pritzker:

As you know, this firm represents the plaintiffs Dale D. Weingarten, JD Sports Park, LLC, and Brown & Green Fort Ann, LLC in the above-referenced matter. Mr. Weingarten sues derivatively on behalf of the two limited liability companies.

The plaintiffs request a conference call with the Court to address recent issues which have arisen. Most notably, Mr. Weingarten just received his K-1 for 2011, which reflects a *zero* percent interest in JD Sports Park, LLC. These K-1s were prepared by Mr. Gallo's office. At the hearings before this Court, and in pleadings, the defendants have acknowledged and conceded that Mr. Weingarten is a 49% owner of JD Sports Park, LLC. Mr. Weingarten faces an October 15, 2012 deadline to file his 2011 tax return, and it is of vital importance that the Court authorize and direct a neutral accounting firm to take control of preparation of the tax returns for JD Sports Park, LLC and Brown & Green Fort Ann, LLC, along with related tax documentation such as the K-1s.

Mr. Weingarten will not be able to file his tax return on a timely basis without immediate court attention and intervention.

Additionally, during the hearings before this Court, Mr. Gallo testified that, at Mr. Braun's direction, he had reported Mr. Weingarten's $80,000 capital investment as a "business loss." Mr. Gallo further acknowledged, in light of Mr. Weingarten's proofs, that the relevant tax documentation would need to be amended to reflect that, in fact, Mr. Weingarten's advance was not "lost," as Mr. Braun had asserted. To date, however, this relatively simple amendment has not been prepared or filed.

Accordingly, in light of the above, the plaintiffs request a conference with the Court to address these pressing and significant issues.

FORMAN HOLT ELIADES RAVIN & YOUNGMAN LLC

Honorable Stan L. Pritzker, J.S.C.
September 13, 2012
Page 2

Thank you.

Respectfully,

Joseph M. Cerra
JMC/pc
cc: James A. Powers, Esq. (by email)
Mr. Dale Weingarten (by email)

<u>Tab 2 to Powers Declaration</u>

Letter to M. Leibman, February 4, 2013 re inapplicability of NY Fee Mediation Process

Law Offices of James A. Powers
580 5th Avenue
Suite 337
New York, New York 10037
Phone: 301-915-8088/Fax: 866-472-4753

By Fax (201-947-2402) and Email (mleibman@ksbdl-law.com)

Marc E. Leibman, Esq.
Kaufman Semeraro et al.
Fort Lee Executive Park
Two Executive Drive
Suite 530
Fort Lee, NJ 07024

Re: Jeff Braun

Dear Mr. Leibman,

You correspondence of today's date is acknowledged.

First, before using canned words like 'specious' and 'meritless,' or endeavoring to elevate the impact of words by bolding, italicizing or underlining them, you should understand what really happened here. This is not a simple fee dispute but Mr. Braun won't want to admit that. Ask if I resigned. Ask if he voiced bald claims of incompetence and legal malpractice but refused to or would not speak truthfully to me. Ask if he or Mr. Fink instructed professionals testifying in this case to not share relevant and material things with this counsel. Ask him if I, Mr. Goodman and/or Mr. Gallo had to intercede vigorously with Mr. Braun educating him on the difference between telling the truth versus telling a court what he wants or what he thinks will get him what he wants.

Second, please re-examine the very laws you cited to me, specifically subsection 137.1 of the Chief Administrator's Rules. I explained to Mr. Braun that this was not a simple fee/mediation claim allowing him mediation and he knows why. My resignation, after working hard and serving this client and this court came because I caught your client acting in an unethical and manipulative manner. So despite my desire to avoid further salting Mr. Braun's self-inflicted wounds, this claim stays in this court and there will certainly be no apology.

In closing, my suggestion is that we call the court together and arrange to have this heard and will contact you tomorrow to do just that.

Sincerely,

James A. Powers, Esq.